

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-20-2007

# Kibinda v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 05-4237

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Kibinda v. Atty Gen USA" (2007). *2007 Decisions.* Paper 1539.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/1539

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 05-4237

———

VALERIO FORTUNATO TUALI KIBINDA,

Petitioner

v.

ATTORNEY GENERAL OF
THE UNITED STATES OF AMERICA,

Respondent

———

On Petition for Review from an
Order of the Board of Immigration Appeals
(Board No. A95 381 152)
Immigration Judge: Charles M. Honeyman

———

Argued January 8, 2007
Before: McKEE, AMBRO and FISHER, *Circuit Judges*.

(Filed: February 20, 2007)

Hyung P. Steele (Argued)
Pepper Hamilton
18th and Arch Streets
3000 Two Logan Square
Philadelphia, PA  19103

Michael S. Hino (Argued)
Pepper Hamilton
899 Cassatt Road
400 Berwyn Park
Berwyn, PA  19312
        *Attorneys for Petitioner*

Richard M. Evans
Paul Fiorino
Susan K. Houser (Argued)
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC  20044
        *Attorneys for Respondent*

———

OPINION OF THE COURT

———

FISHER, *Circuit Judge*.

Valerio Kibinda seeks review of an order of the Board of Immigration Appeals ("BIA") affirming the denial of his request

2

for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). We have jurisdiction to review the petition pursuant to 8 U.S.C. § 1252(a) and will deny the petition.

## I. BACKGROUND

Petitioner Valerio Kibinda, a native and citizen of Angola, is from Cabinda, an oil-rich area administered as an exclave of Angola since Cabindan and Angolan liberation from Portuguese rule in 1975. Many Cabindans believe that their region should be autonomous but the Angolan government strongly suppresses any such notion. A full-scale civil war between a Cabindan separatist group, the "Frente para a Libertação do Enclave de Cabinda" ("Front for the Liberation of the Enclave of Cabinda – FLEC"), and Angolan government forces has been ongoing since 1993.[1] The United States Department of State, an ad-hoc commission of the United Nations, and various humanitarian organizations report that both Angolan government forces and FLEC have committed human rights abuses against their perceived enemies in the course of this bloody dispute.

---

[1]Conflict between the Angolan government and FLEC stretches back to 1975, when Marxist Angolan forces, the "Movimento Popular de Libertação de Angola" ("Popular Movement for the Liberation of Angola – MPLA"), invaded Cabinda, overthrew the provisional government that had been formed by FLEC, and annexed the region to Angola. Cabinda is ethnically and linguistically distinct from the rest of Angola and geographically disconnected from the country.

At age sixteen, Kibinda was identified by the Angolan government as a talented student and sent, allegedly against his will, to Cuba for five years of training at a military institute. After that training was complete, Kibinda was inducted into the Angolan army, again allegedly against his will, and transferred to Angolan army headquarters in the capital city of Luanda. By this time, the Angolan army was fighting rebel forces within Angola, primarily the "União Nacional para a Independência Total de Angola" ("National Union for the Total Independence of Angola – UNITA"), but also FLEC separatist rebels in Cabinda.

During the time Kibinda was stationed in Luanda, an incident occurred that forms part of the basis of Kibinda's claim of past persecution in this case. An order was issued by the Angolan army requiring that all officers remain inside the Luandan military complex due to a violent protest that was being held in the city by the Bakongo ethnic group. Kibinda was discovered returning to his barracks from an overnight stay outside the military complex, which was in violation of the order, and was detained for five days as a result. Describing this incident in his original asylum application, Kibinda stated that he had been arrested and tortured for five days for participating in the Bakongo protest.

However, in an addendum to his affidavit, submitted the day before his immigration hearing, Kibinda retracted this claim.[2] He reiterated that he was detained for five days, but the

---

[2]The first paragraph of this addendum reads:
My original affidavit . . . contains a mistake. . . .

only abuse he described was an incident in which a guard threw an unidentified heavy object into a cell Kibinda shared with six other soldiers. That object hit Kibinda in the jawbone, causing an injury requiring seven stitches. He made no further allegations of abuse or torture in this addendum and attributed the "incorrect" statements in his original affidavit to an error in translation.

No further repercussions occurred after the five-day detention, and four months later Kibinda was selected for officer training. He graduated from that training as a first lieutenant and was shortly thereafter selected along with twenty five other officers for even further military training in Rio de Janeiro, Brazil. While in Brazil, Kibinda studied war tactics, earned an accounting degree from a Brazilian university, and met and married a Brazilian citizen. In the course of the training program, Kibinda was assigned to monitor a younger Cabindan cadet. In 2000, at the end of the program, this cadet told Kibinda of his plans to flee to the Netherlands and seek asylum there. The cadet gave Kibinda a copy of a FLEC membership card that had previously belonged to Kibinda's cousin, telling

---

[I]t refers to an incident in 1993 where I was imprisoned for a period of five days. . . . [I]t states that I was accused of taking part in the Bakongo Revolt of 1992, and that I had been tortured while in custody and sustained injuries that required me to be hospitalized for one month. This is incorrect.

Addendum to Respondent's Affidavit at 1.

5

Kibinda that it would help him find support and assistance from fellow Cabindans in other countries. Kibinda testified that this FLEC card was discovered by an officer with whom he shared living quarters and turned over to his superiors.

Kibinda took the Cabindan cadet to the airport under the pretense that the cadet was returning to Angola as expected. Instead, the cadet fled to the Netherlands as planned. When the cadet failed to report back to army headquarters in Angola, Kibinda was called in for questioning by his commander. Kibinda alleges that he was told he would be held accountable if the cadet did not return to Angola. After this confrontation, Kibinda decided to leave Brazil and flew to the United States on a valid tourist visa, apparently with the intention of traveling on to Canada to seek asylum there. He never went to Canada, however, but returned two months later to Brazil to collect back pay of $6,000.00, which was half of what he was owed by the Angolan army. While back in Brazil, Kibinda was promoted to the rank of lieutenant and ordered back to Angola, where he was told he could collect the remainder of his back pay. Suspecting that the promotion was merely a ruse to "entice" him back to Angola for punishment, he returned to the United States on his still-valid tourist visa. His wife joined him on December 23, 2001. On January 10, 2002, Kibinda, acting pro se, filed a timely asylum application.

At Kibinda's hearing, the immigration judge ("IJ") found that an adverse credibility determination was not warranted, and that Kibinda had a genuine subjective fear of persecution. However, he found Kibinda's subjective fear of persecution was objectively unreasonable in light of the record. Specifically, he pointed to the investment made in Kibinda by the Angolan

6

government, and found that Kibinda's record of promotion within the army suggested that he was trusted and valued by the army and thus unlikely to be persecuted. In addition, he cited the general rule that fear of conscription and punishment for desertion cannot form the basis of a cognizable asylum claim, and found that Kibinda failed to qualify for an exception to that rule.

Consequently, the IJ concluded that Kibinda's fear of persecution was not "well founded" and denied his request for asylum.[3] Because Kibinda had not met the lower standard of proof for establishing an asylum claim, the IJ concluded that he necessarily did not qualify for withholding of removal. As for the CAT claim, the IJ found that the evidence in the record did not establish that Kibinda was likely to be tortured if removed to Angola. Kibinda appealed the IJ's decision to the BIA and submitted a motion to admit new evidence on appeal, which was properly denied.[4] The BIA affirmed the decision of the IJ,

---

[3]Alternatively, the IJ found that even if Kibinda had met his burden of establishing statutory eligibility for asylum, asylum should be denied in the exercise of discretion because "respondent has not met his burden of proving by a preponderance of the evidence that he merits a favorable exercise of discretion because he has not proven that he could not acquire legal immigration status in Brazil."

[4]We review the BIA's refusal to reopen the record to include supplemental documents and remand to the IJ for abuse of discretion. *Ezeagwuna v. Ashcroft*, 325 F.3d 396, 405 (2003). The BIA found that Kibinda had failed to adequately explain

adopting its findings and reasoning. Kibinda filed a timely petition for review.

## II. DISCUSSION

In this case, because the BIA adopted the reasoning of the IJ in its decision, we review the decision of the IJ. *Abdulai v. Ashcroft*, 239 F.3d 542, 549 n.2 (3d Cir. 2001). We must uphold the IJ's findings if there is substantial evidence in the record to support them, which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Senathirajah v. INS*, 157 F.3d 210, 216 (3d Cir. 1998) (citation omitted). Under this deferential standard, the IJ's "finding must be upheld unless the evidence not only supports a contrary conclusion, but compels it." *Abdille v. Ashcroft*, 242 F.3d 477, 483-84 (3d Cir. 2001) (citing *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992)).

### A.    Asylum

Kibinda first argues that there is not substantial evidence for the IJ's conclusion that he was not statutorily eligible for asylum. To be eligible by statute, an asylum applicant must demonstrate refugee status by showing past persecution or a well-founded fear of future persecution. 8 U.S.C. § 1158(b)(1).

---

why these documents, which predated his hearing before the IJ, were previously unavailable. Furthermore, the BIA found that these documents were inconsistent with Kibinda's own testimony. Therefore, the BIA did not abuse its discretion in refusing to supplement the record and remand for further proceedings.

In order to establish past or future persecution, an applicant must "show past or potential harm rising to the level of persecution on account of a statutorily enumerated ground that is committed by the government or by forces the government is unable or unwilling to control." *Fiadjoe v. Att'y Gen.*, 411 F.3d 135, 160 (3d Cir. 2005) (citation omitted). A showing of past persecution gives rise to a rebuttable presumption of a well-founded fear of future persecution. 8 C.F.R. § 1208.13(b)(1).

### 1. *Past Persecution*

At the outset, we dismiss out of hand Kibinda's claim of past persecution in the form of "torture" during his five-day detention by the Angolan army. Kibinda argues that the IJ failed to "develop" the torture claim at Kibinda's hearing. However, as already stated, *supra*, Kibinda unequivocally retracted this claim in an amendment to his asylum application, describing it as a mistake attributable to an error in translation. In addition, Kibinda swore at his immigration hearing that the entire substance of his application for asylum, as amended, was true and correct. It is self evident that an IJ has no obligation (or authority, for that matter) to reach back into the record to revive and "develop" a claim that a petitioner has explicitly disavowed. Thus, we reject any attempts by Kibinda to now reassert a claim of "torture."

Even so, past persecution need not rise to the level of torture to be grounds for asylum. In *Fatin v. INS*, 12 F.3d 1233 (3d Cir. 1993), we accepted the BIA's definition of the term "persecution" to include "threats to life, confinement, torture, and economic restrictions so severe that they constitute a threat to life or freedom." *Id.* at 1240. We made clear that persecution

9

refers only to "severe" conduct and "does not encompass all treatment our society regards as unfair, unjust or even unlawful or unconstitutional." *Id.*

Kibinda's detention by the Angolan army and the attendant circumstances of that detention simply do not rise to the level of persecution as we have defined it. In order to form the basis for an asylum claim, the conduct complained of must be "extreme." *Id.* at 1243 ("'[P]ersecution' is an extreme concept that does not include every sort of treatment our society regards as offensive."). The maltreatment Kibinda experienced at the hands of prison guards, as offensive as it may be, was far from unusual or extreme. In addition, the injury Kibinda suffered as a result of this maltreatment, though it left a scar, was certainly not severe, requiring as it did only a few stitches. *See Voci v. Gonzales*, 409 F.3d 607, 615 (3d Cir. 2005) ("[O]ur cases suggest that isolated incidents that do not result in serious injury do not rise to the level of persecution.") (3d Cir. 2005). While we do not mean to suggest that the severity of an injury should be measured in stitches, Kibinda has provided no other objective evidence to demonstrate that the single injury he suffered was severe enough to constitute persecution under our stringent standard.[5]

---

[5]An alien's testimony by itself, if credible, can satisfy the burden of establishing a claim for relief by objective evidence. *See* 8 C.F.R. § 208.13(a); *Dia v. Ashcroft*, 353 F.3d 228, 247 (3d Cir. 2003). Here, Kibinda's testimony did not satisfy that burden.

Furthermore, even assuming that the injury was severe enough to constitute persecution, Kibinda has failed to establish that this maltreatment was on account of a statutorily protected ground. In fact, the ambiguous circumstances surrounding the incident – "something" heavy was thrown in the darkened cell at numerous individuals and hit Kibinda in the jaw – make it difficult if not impossible to ascertain what motive there was for the incident and whether or not Kibinda was even the intended target.[6]

## 2. *Future Persecution*

When an asylum request is based on a fear of future persecution, a petitioner must show a well-founded subjective fear, which is "supported by objective evidence that persecution is a reasonable possibility." *Lin v. INS*, 238 F.3d 239, 244 (3d Cir. 2001). The IJ found Kibinda's fear of being persecuted

---

[6]Counsel for Kibinda argues "it is reasonable to conclude that the harm [Kibinda] suffered was motivated at least, in part, by an actual or imputed ground establishing the nexus for a finding of past persecution." Reply Br. of Pet'r 7. They fail to provide any objective evidence, direct or circumstantial, however, of a link between the incident and Kibinda's Cabindan heritage. In *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992), the Supreme Court explained that an asylum applicant is not required to provide "direct proof of his persecutors' motives" in order to make out a claim of past persecution. *Id.* at 483. However, because "the statute makes motive critical, [a petitioner] must provide some evidence of it, direct or circumstantial." *Id.*

11

based on his suspected Cabindan sympathies was objectively unreasonable. This finding is supported by ample evidence in the record that Kibinda had always been valued and trusted by the Angolan army. The Angolan government selected Kibinda for ten years of special schooling and officer training and promoted him twice, to a final rank of lieutenant. In addition, the record indicates that the Angolan army did nothing to discipline Kibinda after discovering he had a FLEC card and that he had helped a Cabindan cadet desert and in fact promoted Kibinda afterwards.[7] This is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Senathirajah*, 157 F.3d at 216. Consequently, we uphold the IJ's finding that, based on this evidence, there is no reasonable possibility of persecution if Kibinda is removed to Angola.[8]

---

[7]Although the IJ did not find that Kibinda's overall testimony merited an adverse credibility determination, he did find it "implausible" that Kibinda was promoted by the Angolan army even though the army suspected him to be a FLEC sympathizer.

[8]Kibinda also argues that he would be persecuted by members of FLEC if removed to Angola. However, Kibinda did not make any such claim before the IJ or BIA and cannot raise that claim for the first time in a petition for review. *See* 8 U.S.C. § 1252(d)(1). This statutory requirement, intended to ensure that the BIA has had a full opportunity to consider a claim before it is submitted to a federal court, requires that a petitioner "raise and exhaust his . . . remedies as to each claim

12

Kibinda further argues he is entitled to asylum because the punishment he will face as a deserter will be disproportionately greater because he is a Cabindan. Disproportionate punishment may constitute persecution in an appropriate case. *See Matter of A-G-*, 19 I. & N. Dec. 502, 502 (BIA 1987) ("Persecution for failure to serve in the military may be established in those rare cases where a disproportionately severe punishment would result on account of one of the five grounds enumerated in section 101(a)(42)(A) of the [INA]."). This is an exception to the general rule that punishment for desertion does not constitute persecution for purposes on an asylum claim. *See Lukwago v. Ashcroft*, 329 F.3d 157, 168 ("It is generally accepted 'that a sovereign nation enjoys the right to enforce its laws of conscription, and that penalties for evasion are not considered persecution.'") (citation omitted).

This record does not support application of the disproportionate punishment exception to the general rule. Kibinda's fear of disproportionately severe punishment based on his Cabindan heritage is belied by the same record evidence cited by the IJ in finding Kibinda's fear of persecution was objectively unreasonable. Kibinda, despite his Cabindan heritage, was singled out for special training and promotions throughout his career, and was always treated by the Angolan army as a valued and trusted member, right up until the time he deserted the army and left for the United States. Absent any

_____

or ground for relief if he . . . is to preserve the right of judicial review of that claim." *Abdulrahman v. Ashcroft*, 330 F.3d 587, 594-95 (3d Cir. 2003).

13

objective evidence to the contrary, we find substantial evidence supports the conclusion that any punishment Kibinda may receive upon removal can therefore only be attributed to his status as an army deserter.

Next, Kibinda argues he is entitled to asylum based on his fear of being put in a position that would require him to commit human rights abuses condemned by the international community against his own people.[9] *See Islami v. Gonzales*, 412 F.3d 391 (2d Cir. 2005). This exception to the rule that punishment for desertion is not persecution is relevant to both past and future persecution. It is generally applicable as a means of demonstrating past persecution to individuals who have refused in the past to serve in an internationally condemned military force and have fled to avoid participation. *See id.* at 398 ("[T]he past persecution consisted of the Serb-led military engaging in ignominious activities, and Islami having to flee to avoid participation in such acts which, in many instances were perpetrated against his own besieged ethnic/religious community."). It is relevant to a fear of future persecution insofar as courts have recognized that where conscription places an individual in a position in which he *might be* forced to commit acts that the international community condemns, punishment for refusing to participate in such acts may amount to persecution for purposes of an asylum claim. *See Matter of*

---

[9]Kibinda presents this argument under the rubric of "past persecution" in his brief, but as will become clear from our discussion, we think it more appropriate to consider the claim as an aspect of Kibinda's prospective fears.

14

*A-G-*, 19 I&N Dec. at 506, *aff'd sub nom.*, *M.A. A26851062 v. United States INS*, 899 F.2d 304 (4th Cir. 1990). *See also Mekhoukh v. Ashcroft*, 358 F.3d 118, 126 (1st Cir. 2004); *Mojsilovic v. INS*, 156 F.3d 743, 747 (7th Cir. 1998).

Kibinda, of course, has not refused to serve in the military. In that regard, Kibinda's case can be distinguished from *Islami*, the primary case upon which he relies, in which the petitioner "escaped from Kosovo . . . to avoid being conscripted into the Yugoslavian military . . . ." 412 F.3d at 393. We might concede that this is a distinction without a difference, insofar as Kibinda alleges that he now refuses to serve in the military in order to avoid being placed in a position in which he might be forced to commit internationally condemned human rights abuses against his own people. We might even concede for the sake of argument that the Angolan campaign to suppress the Cabindan separatist movement qualifies as an internationally condemned campaign, although that question was not resolved in the briefs or at oral argument.

Even so, Kibinda has presented no objective evidence that it is a reasonable possibility that he will be placed in such a position or that he will be punished if he refuses to participate in a campaign of atrocities against his own people. Kibinda articulated only a speculative fear of having to fight his own people, a fear that he had felt since he was first inducted into the army, and one that never came to fruition in more than a decade of service in the army.[10]  He failed to present any objective

---

[10]Although we need not resolve the issue of whether the Angolan campaign in Cabinda is an internationally condemned

15

evidence that he would be forced to participate in any human rights abuses if returned to Angola. In fact, he testified that he had seen combat only once, in the course of a sixteen day battle against non-Cabindan rebel forces in an area outside of Cabinda. Furthermore, he presented no objective evidence suggesting that he would be punished for refusing to participate in any such activities. "[I]t is the punishment for refusing to serve in an internationally condemned military . . . that constitutes persecution. Therefore, when an alien does not wish to be associated with a military that engages in universally condemned acts of violence, 'the only relevant factor is the likelihood that the alien will be punished.'" *Mojsilovic*, 156 F.3d at 747 (quoting *M.A. A26851062 v. INS*, 858 F.2d 210, 214-15 (4th Cir. 1998) (en banc)). As we do not find that the record evidence is "so compelling that no reasonable fact finder could fail to find the requisite fear of persecution," *Elias-Zacarias*, 502 U.S. at 483-84, we must uphold the conclusion of the IJ on this issue.

In summary, applying a deferential standard of review, we find substantial evidence supports the IJ's conclusion that Kibinda had not established past persecution and did not have an objectively well founded fear of persecution. He is therefore not

---

campaign, we note that, standing alone, a fear of having to fight one's own people may "reflect the unpleasant realities of civil war" but does not necessarily "contemplate [] ethnic cleansing and other atrocities." *Mojsilovic v. INS*, 156 F.3d 743, 747 (7th Cir. 1998).

16

statutorily eligible for asylum.[11]  As Kibinda has failed to establish a well-founded fear of persecution, he has failed to meet the higher standard of demonstrating a "clear probability" of persecution and thus is also not eligible for withholding of removal. *Balazoski v. INS*, 932 F.2d 638, 640 (3d Cir. 1991).

B.  The Convention Against Torture

Kibinda's final claim is that he is eligible for withholding of removal under the CAT.  An applicant seeking relief under the CAT must establish "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal."  *Sevoian v. Ashcroft*, 290 F.3d 166, 174-75 (3d Cir. 2002) (quoting 8 C.F.R. § 208.16(c)(2)).  Although the standard

---

[11]Because we uphold the IJ's finding that Kibinda was not entitled to asylum under the statute, we need not review the IJ's alternative ruling that Kibinda would nevertheless be ineligible for asylum as an exercise of discretion because he failed to show that he could not resettle in Brazil.  However, we note that under our precedent the Government carries the initial burden of showing that an offer of "firm resettlement" exists, *Abdille v. Ashcroft*, 242 F.3d 477, 486 (3d Cir. 2001), and to the extent the question of firm resettlement in this case turns on Brazilian law, the Government was required to set forth evidence of the substance of that law.  *Id.* at 491-92.  Kibinda declined to designate a country of removal and the IJ settled on Angola as the country of removal.  Nothing in this opinion should be construed as barring removal or voluntary departure to Brazil, should that become a possibility because Kibinda's wife is Brazilian.

for establishing a CAT claim is more stringent than the asylum standard, it does not follow that a failure to meet the asylum standard necessarily precludes a CAT claim. *See Ghebrehiwot v. Att'y Gen.*, 467 F.3d 344, 358 (3d Cir. 2006) (finding IJ committed legal error in holding that failure to meet the evidentiary burden for asylum precluded relief under the CAT); *Amanfi v. Ashcroft*, 328 F.3d 719, 725 (3d Cir. 2003) ("A petition for protection under the Convention Against Torture differs significantly from petitions for asylum or withholding of removal because the alien need not demonstrate that he will be tortured on account of a particular belief or immutable characteristic.").

However, the IJ in this case did not conclude that Kibinda was ineligible for CAT relief simply because he had failed to meet his asylum burden of proof. Rather, the IJ stated that "[t]aking this [asylum] analysis into account, but also reviewing all of the credible source materials in the record, the Court does not find it more likely than not that respondent would be tortured . . . ." In assessing the risk of torture, the IJ was required to consider "all evidence relevant to the possibility of future torture." 8 C.F.R. § 208.16(c)(3) (2000). Various reports were admitted into evidence at Kibinda's immigration hearing, including official country reports prepared by the U.S. State Department, as well as reports from private organizations such as Human Rights Watch and Amnesty International. The IJ considered these various sources and concluded that Kibinda was not likely to be tortured if returned to Angola. While these sources do report some incidents of torture in Angola, the evidentiary record as a whole does not "compel" a contrary conclusion, *Elias-Zacarias*, 502 U.S. at 481 n.1, that torture will

18

more likely than not occur if Kibinda is removed to Angola. Thus, we must uphold the IJ's finding with respect to Kibinda's CAT claim.

## III.

For the foregoing reasons, we conclude that substantial evidence supports the BIA's and IJ's decisions to deny relief, and we will accordingly deny the petition for review.

19